(No. 34367.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM J. FAULKNER, Plaintiff in Error.

*Opinion filed September 20, 1957—Rehearing denied Nov. 19, 1957.*

Louis A. Rosenthal, of Chicago, for plaintiff in error.

Latham Castle, Attorney General, of Springfield, and Benjamin S. Adamowski, State's Attorney, of Chicago, (Fred G. Leach, L. Louis Karton, and John T. Gallagher, of counsel,) for the People.

Mr. Justice Daily delivered the opinion of the court:

The defendant, William J. Faulkner, was indicted in the criminal court of Cook County for the unlawful sale of a narcotic drug to one Maurice Koen, and after pleading not guilty and waiving trial by jury, he was convicted of the crime charged. Thereupon, defendant moved for a new trial but at the subsequent hearing on March 23, 1955, the motion was overruled by the court. Prior to sentencing and after defendant had waived his right to offer mitigating evidence, the court received statements in aggravation of the offense from the prosecuting attorney concerning Faulkner's prior criminal record and immediately thereafter sentenced Faulkner to the State penitentiary for an indeterminate two-to-twenty-year term. Upon writ of error he now contends (1) that he was not proved guilty beyond a reasonable doubt; (2) that evidence in the case was illegally obtained; (3) that he was not properly represented by counsel during the post-trial proceedings, and (4) that

prejudicial and improper statements were made by the prosecutor in aggravation of the offense.

We will first consider the defendant's contention that the evidence did not establish his guilt beyond a reasonable doubt. On the afternoon of November 18, 1954, Maurice Koen was found to be in possession of narcotics and was arrested by George T. Sims, a Chicago police officer assigned to the Narcotics Bureau. From the testimony of Koen, Sims, and Norris M. Durham, a United States treasury agent who later joined in the case, it appears that Koen agreed to cooperate with the police in apprehending other narcotics law violators and preparatory thereto was stripped of his clothing and thoroughly searched for narcotics, money, or other objects. After each of his garments was examined by Sims and another officer, Koen was allowed to dress and was given $125 in bills with which to purchase such drugs. The serial numbers of the bills were carefully noted and listed on a separate sheet of paper which was checked and signed by Koen, Sims, and two other officers. Before leaving the police station Koen telephoned suite 431 of an apartment building located at 4537 Drexel Boulevard, Chicago, and, accompanied by Sims, then proceeded by automobile to that address where they met agent Durham and four other police officers. At approximately 7:00 P.M. Koen left the automobile, entered the apartment building, took an elevator to the fourth floor, knocked on the door of apartment 431, and was admitted by an acquaintance, Mary Spencer. Up until this time all of Koen's activities had been observed by agent Durham who followed Koen into the building and waited in the fourth floor hallway for his return. According to Koen, Faulkner was in the apartment when he entered, and upon being advised of Koen's desire to purchase an ounce of heroin, the defendant promised to get it for him, took the marked $125 in payment therefor, and told Koen to return for the narcotics in about an hour. Upon leaving the apartment Koen was joined by

Durham and together they returned to the automobile which was parked across the street from the building entrance. After about 30 minutes Faulkner was seen leaving the building on foot but some 20 to 30 minutes later he returned driving a Cadillac automobile and again entered the apartment house. Koen waited a few minutes and then went back to the apartment, being at all times followed by agent Durham. Upon knocking at the door on this second visit Koen was again admitted by Mary Spencer. As stated by Koen, Faulkner was talking on the telephone when he entered and upon being asked about the heroin, the defendant pointed to his coat which was lying some four feet away, whereupon Koen reached into the coat pocket, pulled out a brown envelope, told Faulkner good-bye, and left the apartment. Again, agent Durham was waiting in the hallway outside the apartment and together they returned to the automobile where the brown envelope was given to Sims, who immediately opened it and removed a glassine package containing a white powder. He next tore the glassine package open and submitted some of its contents to a field examination called the Marquis Reagent Test from which it was determined that the substance contained an opium derivative. Armed with this information, Koen, Durham, Sims, and a third police officer returned to the fourth floor apartment and rapped for admittance whereupon a lady's voice inside the apartment asked who it was. Koen replied that it was he, and Mary Spencer again opened the door admitting Koen and the police officers. When they entered, Faulkner was sitting on the apartment couch, and after being identified by Koen as the man from whom the narcotics had been purchased, Faulkner was arrested and asked to remove all money from his person. By comparing the serial numbers, it was determined that Faulkner possessed $100 of the money which had been given to Koen by the police earlier that evening. Both Faulkner and Mary Spencer were subsequently removed to the police station.

In defense, Faulkner testified that he had never sold any narcotics to Koen but that he had arrived at the apartment just a few minutes before the police entered. He admitted that marked money was found in his possession but explained that it was collected upon a debt owed by Koen to a mutual friend. According to his account the friend had told Koen to pay $100 to Faulkner, and in compliance therewith Koen had left the money with Mary Spencer earlier that evening. She in turn gave the bills to the defendant before the police arrived. When asked why he was seen leaving the building about 7:30 P.M., Faulkner stated that he had visited a girl on the sixth floor and was then going to a neighborhood bar.

Mary Spencer corroborated the defendant's account. She testified that Koen visited her apartment three times on the evening in question, the first appearance being at approximately 7:00 P.M. On this occasion, the witness stated Koen left $100 for Faulkner but returned about 8:00 P.M. to see if Faulkner was there. When told that he was not, Koen left and returned with the police some 15 to 20 minutes later. During this interim, however, Faulkner arrived and was given the money which Koen had left. Mary Faulkner, the defendant's wife, also testified that the mutual friend had in her presence instructed Koen to pay the debt to Faulkner.

Upon these facts we cannot say that the defendant was convicted upon insufficient evidence. In the presence of police officers Koen telephoned the contact, was given $125 in marked bills, went to the apartment, and left with an ounce of heroin. He was thoroughly searched before leaving the station and after returning from his first visit to the apartment. Since he was trailed in and out of the apartment building by agent Durham and was otherwise at all times under police surveillance, the only place he could have disposed of the money and received the heroin was in apart-

ment 431. Faulkner admitted that he had been to the apartment on many occasions and was in the building at the time of Koen's first visit; he was in the apartment when the police entered; and the marked bills were in his possession at the time of his arrest. Although Koen evidently left $125 in bills at the apartment, Faulkner and Spencer could account for only $100, the sum allegedly due upon a debt. It is true that Koen's position was somewhat similar to an accomplice and his testimony warranted close scrutiny, but when corroborated by other evidence, its credibility was a matter to be determined by the trial court. *People* v. *Hamby*, 6 Ill.2d 559.

Next, the defendant contends that the $100 in marked bills which were found upon his person at the time of the arrest were taken by illegal seizure since no search warrant had been procured and for that reason should not have been allowed in evidence. The argument has no merit when applied to the present facts. Here, a crime had in fact been committed and the arresting officer had reason to believe that Faulkner was implicated in the criminal offense. This being true, the officer not only had a right to arrest the defendant and search his person without first procuring a search warrant, (*People* v. *Clark*, 7 Ill.2d 163; *People* v. *DePompeis*, 410 Ill. 587; *People* v. *Humphreys*, 353 Ill. 340), but also was empowered to seize the incriminating items within his immediate control. *People* v. *McGowan*, 415 Ill. 375; *United States* v. *Rabinowitz*, 339 U.S. 56, 94 L. ed. 653.

The defendant also argues that he was not properly represented by counsel at the hearing upon his motion for a new trial and at time of sentencing. Joseph Clayton, the defendant's trial attorney, entered the usual post-trial motion following Faulkner's conviction and hearing thereon was set for March 22, 1955. On that date Clayton appeared and discussed the matter with the court but the cause itself

was continued until the following day. On the morning of March 23, an attorney by the name of Gayles appeared with the defendant and informed the trial judge that Clayton was engaged in another matter but had asked him to notify the court "that there will be no oral argument on this motion for a new trial." Thereupon the judge, in overruling defendant's motion, commented: "I have read all these points and considered them at various times during the trial, upon motion made and objection raised by the defendant." Before passing sentence, the judge asked if the matter should be continued until Clayton was present but was told by Gayles to proceed. Although the record does not specifically identify attorney Gayles, it clearly indicates that the trial court knew of his connection with Joseph Clayton and was satisfied that he was duly authorized to speak upon Clayton's behalf. The defendant himself was present at the hearing but made no objection thereto nor asked for any continuance. Surely he cannot now complain that his constitutional rights were so violated or that oral argument was waived, especially in view of the fact that the issues involved in his post-trial motion were relatively simple and had been previously passed upon by the court at Clayton's insistence. In such cases the allowance of *any* oral argument is discretionary with the trial judge. (*People* v. *DePompeis*, 410 Ill. 587; *People* v. *Vinci*, 369 Ill. 563; *People* v. *Servilli*, 364 Ill. 190.) It is our opinion that defendant was properly represented at all stages of his trial and sentencing.

Finally, we are asked to determine whether improper statements were made by the prosecutor in aggravation of the offense. Before passing sentence the court announced that it would hear matters in both mitigation and aggravation. Although the defendant waived such right, the prosecuting attorney stated that Faulkner had been convicted of larceny, disorderly conduct, carrying concealed weapons, obtaining money by false pretenses, and counterfeiting at

specified times from 1942 to 1949. The defendant now contends that it was improper for the trial judge to take such unrelated offenses into consideration at the time of sentencing, and in support thereof cites *People* v. *Corry*, 349 Ill. 122; *People* v. *Lane*, 300 Ill. 422; and *People* v. *Meisner*, 311 Ill. 40. Although those cases do state that punishment should be fixed without reference to other crimes, they were concerned with an entirely different situation. The *Lane* and *Meisner* matters were heard before a jury which fixed both guilt and punishment. Although jury was waived in the *Corry case*, the presiding judge was informed of such offenses early in the proceedings. Thus, in all of those decisions the evidence of other offenses was introduced during the trial itself and *prior to the determination of guilt*. On the other hand, the court in the present case was not so advised until some five days after guilt had been established. Section 2 of the Sentence and Parole Act (Ill. Rev. Stat. 1955, chap. 38, par. 802,) expressly provides that "For the purpose of determining the minimum and maximum limits or duration of imprisonment, the court may, *after conviction of the person*, consider the evidence, if any, received upon the trial, and the evidence, if any, as to aggravation and mitigation of the offense, received on a plea of guilty, and may also hear and *receive evidence as to the moral character, life, family, occupation, and criminal record, if any, of such person so convicted."* (Emphasis supplied.) Section 4 of division XIII of the Criminal Code (Ill. Rev. Stat. 1955, chap. 38, par. 732,) was amended in 1953 to require such hearing in all cases where the court possesses some sentencing discretion regardless of whether the defendant had previously entered a guilty or not guilty plea. In its inquiry the court is not bound by the usual rules of evidence found in criminal prosecutions but may search anywhere within reasonable bounds for other facts tending to aggravate or mitigate the offense, including the commission of different crimes

(*People* v. *Vincent*, 394 Ill. 165; *People* v. *McWilliams*, 348 Ill. 333; 15 I.L.P., Criminal Law, sec. 815;) and where no objection is made by the defendant, such prior acts may be called to the court's attention without resorting to formal proof. (*People* v. *Riley*, 376 Ill. 364; *People* v. *Serrielle*, 354 Ill. 182; *Stobble* v. *United States*, 91 F.2d 69.) Since neither Faulkner nor attorney Gayles made any objection to the prosecutor's statements, the lower court committed no error in considering such matter in aggravation of the offense. For the reasons stated, the judgment of the criminal court of Cook County is, therefore, affirmed.

*Judgment affirmed.*