**IN RE: SETTLERS' HOUSING SERVICE, INC., an Illinois Non-Profit, Debtor**

**Settlers' Housing Service, Inc., an Illinois Non-Profit, Plaintiff**

v.

**Schaumburg Bank & Trust Company, N.A., Defendant**

**Bankruptcy No. 13-bk-28022
Adversary No. 13-ap-1328**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

October 7, 2016

William J. Factor, David Paul Holtkamp, Sara E. Lorber, Jeffrey K. Paulsen, The Law Office of William J. Factor, Ltd., 105 W. Madison, Ste. 1500, Chicago, IL 60602, Counsel for Plaintiff.

Susan Valentine, Valentin & Bueschel, P.C., 105 West Adams Street, 35th Floor, Chicago, IL 60603, Counsel for Federal Deposit Insurance Corporation as Receiver for The Bank of Commerce.

Miriam R. Stein, Francisco Connell, Terence G. Tiu, Chuhak & Tecson, PC, 30 S. Wacker Drive, Suite 2600, Chicago, IL 60606, Counsel for Defendant.

## OPINION ON SETTLER'S MOTION FOR PROTECTIVE ORDER TO ALLOW USE OF DOCUMENTS PRODUCED BY FDIC [Dkt. No. 253]

Jack B. Schmetterer, United States Bankruptcy Judge

In this Adversary proceeding as part of the Debtor's Chapter 11 case, Settlers' has moved for Protective Order to Use Documents Produced by the Federal Deposit Insurance Corporation ("FDIC"). A prior opinion dealing with a defense motion to dismiss provided details as to issues presented [Dkt No. 158].

Plaintiff now seeks authorization to use documents produced by the FDIC and which FDIC claims are privileged and has demanded that Settlers' return. Claim of privilege has also been asserted by Schaumburg Bank.

The privilege is now raised in connection with documents produced pursuant to subpoena, see Fed. R. Bankr. P. 9016 (incorporating Fed. R. Civ. P. 45). The subpoena was served by Plaintiff Settlers' on the FDIC as nonparty receiver ("FDIC-R") of the predecessor bank that originated loans later assigned by FDIC-R to Defendant Schaumburg Bank.

FDIC-R invokes the clawback provision of the Stipulation and Protective Order entered herein [Dkt. No. 243], see ¶ 10, which invoked Fed. R. Evid. 502(d). Pursuant to that provision, FDIC-R produced hundreds of documents in response to Settlers' subpoena subject to the right to clawback documents on claim of privilege. After Defendant alerted FDIC-R counsel of the potentially privileged nature of some documents produced, FDIC-R invoked its right to clawback dozens of documents· produced.

Settlers' filed its present Motion in response to Settlers' and FDIC-R's claims of privilege. The privilege claims are with respect to only ten of the documents produced. Settlers' has filed a Supplement [Dkt. No. 271] to its Motion, and FDIC-R and Defendant have each filed Responses [Dkt. Nos. 287, 289]. Settlers' then filed a Reply [Dkt. No. 290].

Settlers' seeks determination that the ten documents produced by FDIC-R consisting of emails sent between officers or managers and attorneys of the predecessor bank and concerning properties involved in the pending litigation are not privileged and may therefore be used by Settlers' at trial. It claims that the asserted attorney-client privilege once held by the predecessor bank was transferred to Defendant Schaumburg Bank and waived by that bank's failure to timely assert a privilege. Alternatively, Settlers' claims that the crime-fraud exception to attorney-client privilege applies.

**Who holds the Privilege?**

Settlers' argues that FDIC-R has not established a right to claim attorney-client privilege with respect to the documents at issue. FDIC-R relies on 12 U.S.C. § 1821(d)(2)(A), providing, in relevant part, as follows:

(d) Powers and duties of Corporation as conservator or receiver

\* \* \*

(2) General powers

(A) Successor to institution

*The Corporation shall, as conservator or receiver, and by operation of law, succeed to—*

(i) *all rights, titles, powers, and privileges of the insured depository institution*, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution; and

(ii) title to the books, records, and assets of any previous conservator or other legal custodian of such institution.

12 U.S.C. § 1821(d)(2)(A)(i) (emphasis added). Settlers' does not dispute that the FDIC-R succeeded to privileges once held by the predecessor bank, but contends that

any such privileges were subsequently transferred to Schaumburg Bank pursuant to the Purchase and Assumption Agreement dated March 25, 2011 (the "P & A Agreement"). The P & A Agreement transferred most assets and interests of the predecessor bank from FDIC-R to another bank (Advantage National Bank Group), later to become Schaumburg Bank.

The parties agree that the P & A Agreement governs the rights of Schaumburg Bank in the properties at issue. It is clear that the FDIC, as receiver was empowered to determine "which assets and liabilities of a failed [bank] should be sold and transferred, and which it should keep." *Payne v. Sec. Sav. & Loan Ass'n, F.A.*, 924 F.2d 109, 111 (7th Cir. 1991) (discussing 12 U.S.C. § 1821(d)(2)). The question here is whether in transferring assets and liabilities of the predecessor bank to Schaumburg Bank pursuant to the P & A Agreement, FDIC-R transferred privileges held by the predecessor bank protecting communications included in the ten documents at issue. Absent an express transfer by FDIC as receiver pursuant to the P & A Agreement, rights, liabilities and privileges of the predecessor bank were retained by the FDIC as receiver. *See Payne*, 924 F.2d at 111.

In claiming that privilege was transferred to Schaumburg Bank, Settlers' points to the following paragraph of the definitions section of the P & A Agreement:

'Loan' or 'Loans' means, individually or collectively, all of the following owed to or held by the Failed Bank as of the Bank Closing Date:

(a) loans (including loans which have been charged off the Failed Bank Records in whole or in part prior to and including the Bid Valuation Date), participation agreements, interests in par-

ticipations, overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account), revolving commercial lines of credit, home equity lines of credit, Commitments, United States and/or State-guaranteed student loans and lease financing contracts;

(b) all Liens, rights (including rights of set-off), remedies, powers, *privileges*, demands, claims, priorities, equities and benefits owned or held by, or accruing or to accrue to or for the benefit of, the holder of the obligations or instruments referred to in clause (a) above, including but not limited to those arising under or based upon Credit Documents, casualty insurance policies and binders, standby letters of credit, mortgagee title insurance policies and binders, payment bonds and performance bonds at any time and from time to time existing with respect to any of the obligations or instruments referred to in clause (a) above
. . . .

(P & A Agreement, at 6–7, Settlers' Supp., Ex. I, at 10–11 (emphasis added).)

With the exception of certain assets expressly excluded in sections 3.5 and 3.6 of the P & A Agreement, Schaumburg Bank purchased from FDIC-R, and FDIC-R sold, transferred, assigned, conveyed and delivered to Schaumburg Bank all "privileges" as earlier quoted, and also "all right, title and interest of [FDIC-R] in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of the Bank Closing Date. ..." (P

& A Agreement, Art. 3, ¶ 3.1, Settlers' Supp., Ex. I, at 15.) In accordance with the sale of such assets, FDIC-R also transferred, assigned, conveyed and delivered to Schaumburg Bank "any and all Records of the Failed Bank, other than the following:

(a) Records pertaining to former employees of the Failed Bank who were no longer employed by the Failed Bank as of the Bank Closing Date and Records pertaining to employees of the Failed Bank who were employed by the Failed Bank as of the Bank Closing Date and for whom the Receiver is unable to obtain a waiver to release such Records to the Assuming Institution;

(b) Records pertaining to (i) any asset or liability of the Failed Bank retained by the Receiver, or (ii) any asset of the Failed Bank acquired by the Receiver pursuant to this Agreement; and

(c) any other Records as determined by the Receiver.

(P & A Agreement, Art. VI, ¶ 6.1, at 27, in Settlers' Supp., Ex. I, at p. 31 of 100.)

Pursuant to section 3.5 of the P&A Agreement, FDIC-R retained the following:

(a) any financial institution bonds, banker's blanket bonds, or public liability, fire, extended coverage insurance policy, bank owned life insurance or any other insurance policy of the Failed Bank, or premium refund, unearned premium derived from cancellation, or any proceeds payable with respect to any of the foregoing;

(b) **any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank on or prior to the Bank Closing Date arising out of any act or omission of such**

**Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank;** provided that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before the Bank Closing Date, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of the Bank Closing Date[.]

(P & A Agreement, Art. III, sec. 3.5, at 14-15, Settlers' Supp., Ex. I, at 18-19.)

FDIC-R thus retained certain specified interests, including claims and causes of action against former employees. To the extent that FDIC-R retained some of the rights and interests of the predecessor bank, it could potentially claim any privileges not transferred to Schaumburg Bank. *See Payne*, 924 F.2d at 111; *In re Fin. Corp. of Am.*, 119 B.R. 728, 736-37 (Bankr. C.D. Cal. 1990). The defendant bank may certainly assert those privileges.

**Attorney-Client Privilege**

FDIC-R's claim of privilege is grounded on Federal Rule of Evidence 501. Pursuant to that rule, privilege claims are governed by federal common law, "[b]ut in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. While Settlers' Supplement invokes Illinois law, federal common law likely governs. Pending litigation involves three types of claims: (1) Objections to allowance of Defendant's claim pursuant to 11 U.S.C. § 502(b)(1) (providing for disallowance where "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . . ."); (2) equitable subordination of the Defendant's claim pursuant to 11 U.S.C. § 510, and; (3) a tortious interference with contract claim under Illinois law which is predicated on post-receivership conduct by the Defendant, not the predecessor bank. Because the documents at issue involve communications by the predecessor bank, only the first two types of claims are relevant. Objections to claims challenge the validity and enforceability of Defendant's asserted mortgage in the Washington-Taylor Property—a question resolved by reference to Illinois law. However, these issues arise in the context of Plaintiff's objection to Defendant's bankruptcy claim, and jurisdiction over such claims exists here to which this Adversary proceeding relates, to the extent such claims need be resolved as part of the claim allowance process and arise under federal law. *See Mem'l Hosp. for McHenry Cty. v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981); *Cf. Berger v. AXA Network LLC*, 459 F.3d 804, 809-10 (7th Cir. 2006). In any event, Illinois and federal common law apply similar principles in deciding whether the attorney-client privilege exists. *See Wielgus v. Ryobi Technologies, Inc.*, 2010 WL 3075666, at *3 (N.D. Ill. Aug. 4, 2010).

██ "The purpose of the attorney-client privilege is to encourage clients to engage in full and frank discussion with their attorneys without the fear of compelled disclosure of information." *MDA City Apartments v. DLA Piper LLP*, 359 Ill.Dec. 694, 967 N.E.2d 424, 429 (2012) (citing *Upjohn Co. v. United States*, 449

U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). When asserted, evidentiary privilege will not be applied unless it "promotes sufficiently important interests to outweigh the need for probative evidence ...." *Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (citation omitted); *see Waste Mgmt., Inc. v. Int'l Surplus Lines Ins. Co.*, 144 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322, 327 (1991) ("[I]t is the privilege, not the duty to disclose, that is the exception. ... Therefore, the privilege ought to be strictly confined within its narrowest possible limits.") (citation omitted)). The attorney-client privilege exists:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. White*, 950 F.2d 426, 430 (7th Cir.1991) (internal quote and citation omitted); *see People v. Radojcic*, 376 Ill. Dec. 279, 998 N.E.2d 1212, 1221 (2013). "The burden of showing facts which give rise to the privilege rests on the one who claims the exemption." *Consolidation Coal Co. v. Bucyrus–Erie Co.*, 89 Ill.2d 103, 59 Ill.Dec. 666, 432 N.E.2d 250, 257 (1982); *see United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997). The mere existence of an attorney-client relationship is not sufficient to cloak all communications with privilege, and claims of privilege must be made on a document by document basis. *White*, 950 F.2d at 430. Only communications that are made for the purpose of obtaining legal advice are protected. *Matter of Grand Jury Proceeding, Cherney*, 898 F.2d 565, 567 (7th Cir.1990). When the parties involve an organization with in-house counsel, communications between the general counsel and an organizational employee are protected only when the employee is seeking legal advice on behalf of the entity itself. *Upjohn*, 449 U.S. at 394, 101 S.Ct. 677; *see Consolidation Coal*, 59 Ill.Dec. 666, 432 N.E.2d at 257.

### Waiver of Privilege

 The attorney-client privilege only shields communications between a lawyer and a client that were intended to be confidential. A breach of this confidentiality through disclosure to a third party can prevent the privilege from attaching. *See People v. Doss*, 161 Ill.App.3d 258, 112 Ill.Dec. 839, 514 N.E.2d 502, 505 (1987) ("Ordinarily the presence of a third person indicates a lack of intention that the communications of a client to his attorney are meant to be confidential and the privilege does not apply.").

 Waiver is commonly defined as "the intentional relinquishment of a known right." *Ryder v. Bank of Hickory Hills*, 146 Ill.2d 98, 165 Ill.Dec. 650, 585 N.E.2d 46, 49 (1991). It may be made by express agreement or may be implied from the conduct of the party who is alleged to have waived his right. *Id.* Implied waiver of a right must be established by a clear, unequivocal, and decisive act of the party alleged to have committed the waiver. *Id.* An implied waiver may arise where the party against whom waiver is asserted pursues a course of action or acts in such a way that demonstrates his intention to waive a right, or his actions are inconsistent with any intention other than waiving the rights. *Id.*

 There was a short delay by the Defendant Bank in asserting the privilege. But after the FDIC position was defined, the Bank did assert the privilege assigned to it. The Bank never did anything expressly to waive the privileges and the

short period of delay did not in this circumstance indicate an intention to waive.

### The Crime-Fraud Exception, If Established, May Apply

Unless the "crime-fraud" exception applies, the documents in question are privileged and cannot be used by Plaintiff at trial. The only remaining question is whether the Plaintiff may show that the exception does apply.

The crime-fraud exception prevents parties from invoking the attorney-client privilege to protect communications made "for the purpose of getting advice for the commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (internal quotation omitted). For the exception to apply, two elements must be present: a crime or fraud must have been attempted or committed, and the communications must have been made in furtherance of the crime or fraud. *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 796 (7th Cir. 2006); *see also* 3 Joseph M. McLaughlin, Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 503.31[4][a] at 503-99 (2014) (describing the "two-part inquiry").

In this circuit, the party invoking the exception must present " 'prima facie evidence' " of these elements, meaning evidence " 'that gives color to the charge by showing some foundation in fact.' " *United States v. Boender*, 649 F.3d 650, 655 (7th Cir. 2011) (quoting *United States v. BDO Seidman LLP*, 492 F.3d 806, 818 (7th Cir. 2007)). Despite the term "prima facie" the standard " 'is not whether the evidence supports a verdict but whether it calls for inquiry.' " *United States v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007) (quoting *In re Feldberg*, 862 F.2d 622, 625 (7th Cir. 1988)); *see also BDO Seidman*, 492 F.3d at 818.

If necessary, a court can examine the communications to determine whether they further or conceal a crime or fraud. *Boender*, 649 F.3d at 656. Because judicial review entails less of an intrusion into the attorney-client relationship, a "lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege." *Zolin*, 491 U.S. at 572, 109 S.Ct. 2619. To warrant an *in camera* inspection, there need only be a "showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Id.* (internal quotation omitted); *see also Boender*, 649 F.3d at 656.

The proceeding is now on trial and evidence is being presented. Plaintiff has the burden of demonstrating that some showing of fraud has been established before it offers any of the otherwise privileged documents into evidenced. Only after that is demonstrated can this Court decide whether the crime-fraud exception is properly asserted and the pending Motion will then be given a dispositive ruling.

When Plaintiff's counsel believes the evidence has met that burden, they must during the trial expressly request such a ruling, and the Court will then hear argument.